FILED
MAY 17 2011

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ELECTRO SCIENTIFIC INDUSTRIES, INC., an Oregon corporation,

Plaintiff,

v.

JAMES T. DOOLEY,

Defendant.

Case No.: 10-CV-1564-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Opinion*

Plaintiff Electro Scientific Industries, Inc., ("ESI") seeks to vacate an arbitration award finding against it and in favor of defendant James T. Dooely. ESI asserts that the arbitrator exceeded his powers by refusing to give preclusive effect to Dooley's guilty plea and conviction for securities fraud by finding that Dooley did not willfully engage in illegal conduct and that ESI's termination

of Dooley was not for cause. The court finds that the arbitrator recognized and reasonably applied relevant case law to the facts before it and that his decision was not completely irrational. Accordingly, ESI's petition to vacate the award is denied.[1]

*Preliminary Procedural Matter*

In support of its motion to vacate, ESI offers excerpts of arbitration proceeding transcripts. The excerpts include cover pages identifying the action, the arbitrator, the date of the proceeding, and the volume number, but do not include a certification by the court reporter. These exhibits have not been properly authenticated under Rule 901(a) of the Federal Rules of Civil Procedure. In *Orr v. Bank of America*, 285 F.3d 764 , 774 (9th Cir. 2002), the Ninth Circuit held that:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted). This court previously has applied *Orr's* rule to exclude improperly submitted testimonial excerpts. *See, e.g., Chao v. Westside Drywall*, 709 F. Supp. 2d 1037 (D. Or. 2010), and *Kesey v. Francis,* No. CV. 06-540-AC, 2009 WL 909530 (D. Or. April 3, 2009), The court sees no reason why this rule is not equally applicable to excerpts from proceeding transcripts offered in support of a motion to confirm or vacate an arbitration award. The proceeding transcript excerpts are not admissible evidence and will not be considered by the court.

---

[1]The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

*Background*

In June 2000, ESI hired Dooley as Chief Financial Officer, a position he held until December 2002, when he as promoted to Chief Executive Officer ("CEO"). On December 13, 2002, ESI and Dooley memorialized the promotion and entered into an employment agreement setting forth the terms and conditions of Dooley's employment as CEO (the "Agreement"). (Rosenbaum Decl. Ex. 3.) The Agreement provided for an employment term of just over three years terminating on December 31, 2005. (Rosenbaum Decl. Ex. 3 at 3.) ESI retained the ability to terminate Dooley during that period with differing financial obligations. If ESI terminated Dooley without cause, Dooley was entitled to a severance payment equal to two times Dooley's base salary at the time of termination. (Rosenbaum Decl. Ex. 3 at 4.) In the event he was terminated for cause, Dooley was entitled only to the base salary and annual bonus earned and payable through the date of termination. (Rosenbaum Decl. Ex. 3 at 3-4.) The Agreement defined "cause" in relevant part as:

> (ii) the willful engaging by [Dooley] in illegal conduct which is materially and demonstrably injurious to ESI. For purposes of this subsection (a), no act, or failure to act, on [Dooley's] part shall be considered "willful" unless done, or omitted to be done, by [Dooley] in knowing bad faith and without reasonable belief that his action or omission was in, or not opposed to, the best interests of ESI. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or based upon the advise of counsel for ESI shall be conclusively presumed to be done, or omitted to be done, by [Dooley] in good faith and in the best interest of the corporation.

(Rosenbaum Decl. Ex. 3 at 2.)

In late Spring 2002, Dooley looked into the legality of eliminating termination-of-employment benefits for employees working in ESI's Asian offices located in Japan, Taiwan, and Korea which were substantially more generous than those offered to employees working elsewhere (the "Benefits"). (Rosenbaum Decl. Ex. 1 at 6.) The Benefits represented nearly one million dollars

in accrued reserves reported on ESI's financial statements which, if eliminated, would dramatically improve the financial position of ESI. (Rosenbaum Decl. Ex. 1 at 7.) Dooley directed his accounting staff to research the legality of the elimination of the Benefits and was subsequently advised that the Benefits were required in Taiwan and Korea, but not in Japan. (Rosenbaum Decl. Ex. 1 at 7.) Based on this information, Dooley ordered the termination of the Benefits for ESI's Japanese employees, and a reversal of the accrued reserves on the ESI's financial statements for the first quarter of fiscal year 2003 (August 31, 2002).[2] (Rosenbaum Decl. Ex. 1 at 7.)

In September 2002, Dooley represented to Richard Callahan, a partner of KPMG, LLP ("KPMG"), ESI's independent auditing firm, that the elimination of the Benefits for the Japanese employees was legal. (Rosenbaum Decl. Ex. 1 at 7.) There is conflicting evidence with regard to whether Dooley specifically stated that the elimination of the Benefits had been approved by legal counsel or whether Callahan merely assumed that legal counsel had approved the elimination based on Dooley's representation. (Rosenbaum Decl. Ex. 1 at 7.) In any event, the elimination of the Benefits created legal and financial issues for ESI which had to be remedied. (Rosenbaum Decl. Ex. 1 at 7-10.)

On June 9, 2003, the Board adopted a resolution terminating Dooley's employment for cause based, in large part, on Dooley's handling of the elimination of the Benefits. The resolution indicated that:

> [Dooley] has willfully engaged in illegal conduct which is materially and demonstrably injurious to ESI by (i) directing the misstatement of its financial statements, (ii) knowingly and falsely certifying to the accuracy of its financial

[2]The accrued reserves for ESI's employees in Taiwan and Korea, in the amount of approximately $160,000, were inadvertently reversed at this time as well. This error was later corrected.

> statements, and (iii) knowingly participating in other improper and illegal conduct relating to the financial affairs and reports of ESI.

(Rosenbaum Decl. Ex. 1 at 5.) ESI did not provide Dooley with the severance package he would have been entitled to had he been terminated without cause.

In 2004, a federal grand jury indicted Dooley on sixteen counts of financial fraud. The original indictment was filed September 23, 2004, with a superceding indictment for the same sixteen counts filed on June 17, 2005. Count 11 of the superceding indictment ("Count 11") alleged that:

> 2. On or about September 12, 2002, in the District of Oregon and elsewhere, the defendant,
>
> JAMES T. DOOLEY
>
> knowingly and willfully caused to be made a materially false and misleading statement, and omitted to state material facts necessary in order to make a statement made, in light of circumstances under which the statement was made, not misleading, to ESI's accountants in connection with the review and examination of the financial statements of ESI, namely, ESI's quarterly reports, Form 10-Qs, required to be filed with the SEC. Specifically, DOOLEY made a materially false oral representation to a partner of KPMG, that management, including DOOLEY, had resolved on or before August 31, 2002, to reverse the Asian Benefit Accrual and eliminate the retirement benefits and that management, including DOOLEY, had received input from the Human Resource Department and had reviewed the decision with legal counsel, when the defendant well knew the information was false and misleading.
>
> **All in violation of Title 15, United States Code, Sections 78m(a), 78m(b)(2), 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.**

(Rosenbaum Decl. Ex. 4 at 36-37.)

On June 25, 2007, Dooley pleaded guilty to Count 11 of the Indictment. In his plea petition, Dooley represented that he was represented by counsel, that he had discussed his case with his attorneys fully, and that he had been advised and understood that by pleading guilty to Count 11 he

was admitted the following elements of the charge alleged against him:

> *First*, defendant was a director or officer of a publicly traded company;
>
> *Second*, the defendant made or caused to be made a materially false or misleading statement to an accountant or omitted to state or caused another person to omit to state, any material fact necessary in order to make statement made, in light of the circumstances under which such statements were made, not misleading to an accountant;
>
> *Third*, the statement was made in connection with any audit, review, or examination of the financial statements of the publicly traded company, or in connection with the preparation or filing of any document or report required to be filed with the SEC; and
>
> *Fourth*, the defendant acting knowingly and willfully and with an intent to defraud in making or causing the false statements to be made or acted knowingly and willfully and with an intent to defraud in omitting or causing another to omit any material fact.

(Rosenbaum Decl. Ex. 5 at 2.) Dooley specifically requested the court accept his plea of guilty to Count 11 recognizing that "the judge must be satisfied that a crime occurred and that I committed that crime before my plea of "GUILTY" can be accepted." In support of his guilty plea, Dooley represented that he "did the following and that the following facts are true:"

> From 2000 to December 2002, I was the Chief Financial Officer of ESI. From April 2002 to until December 2002, I was acting Chief Operating Officer of ESI. Throughout the late spring and summer of 2002, I discussed with ESI's CEO David Bolander and other ESI officers and employees the feasibility of eliminating a benefit plan that ESI had in place for its employees in Taiwan, Japan, and South Korea. This benefit plan was known as the Asian Benefit Account ("ABA"). The ABA was more generous than similar plans in other countries in which ESI maintained operations with employees, including domestically, where the majority of ESI employees were located. In particular, it provided for identical severance benefits – one month's pay for each year that the employee served in the company – regardless of whether an employee retired, or was laid off for business reasons, was terminated for cause, or left voluntarily to join a competitor. After speaking with a number of company personnel, David Bolander, ESI's CEO, and I agreed that we would terminate the ABA, if it were not legally required, and would install a benefit plan more in line with the benefit plans in other ESI offices.

> I directed employees in the Human Resources Department and in Finance Department at ESO to determine whether we were legally obligated to have such a benefit for employees in those countries. I was advised in August 2002 by the International Controller that it had been determined that there was no legal requirement for such a program in Japan, although there was such a requirement in Korean and Taiwan. Consequently, and in accord with the decision I had reached with Mr. Bolander, I determined, before the end of August 2002, to terminate the plan in Japan and to begin work on the installation of a new benefits plan similar to the plans in the majority of other ESI offices. I directed that the Asian Benefit Accrual be eliminated in Japan.
>
> On September 12, 2002, in connection with the review of ESI's first quarter financial statements, I met with a partner from ESI's outside auditors, KPMG, and informed him that ESI had determined that there was no legal requirement to maintain the ABA for Japanese employees and the ESI management had determined to eliminate the ABA program for Japanese employees. However, I failed to tell him that as of that time ESI had not obtained an opinion from a law firm to that effect and that the information was based upon research done by ESI personnel.
>
> Subsequently, in early October 2002, I learned that ESI's Japanese law firm had raised questions as to the absolute ability of ESI to unilaterally terminate the ABA for Japanese employees without legal consequences. Immediately upon learning that, I directed ESI's general counsel and ESI's director of Human Resources to verify with the Japanese law firm ESI's ability to terminate the ABA account for Japanese employees under the then-current circumstances, and I was shortly thereafter advised that they had confirmed that they had confirmed that we could do so

(Rosenbaum Decl. Ex. 5 at 7-8.) In accepting Dooley's guilty plea, Judge Haggerty found that Dooley had "admitted facts that prove each of the necessary elements of the crime(s) to which the defendant has pled guilty." (Rosenbaum, Decl. Ex. 5 at 11.)

On June 2, 2008, Judge Haggerty sentenced Dooley to two years probation with six months of home detention and 500 hours of community service work. (Rosenbaum Decl. Ex. 6.) Just over a year later, Dooley filed a demand for arbitration asserting that he was entitled to severance benefits from ESI because ESI did not have the requisite "cause" to terminate him under the terms of the

Agreement. (Petranovich Decl. Ex. 10.) On September 17, 2009, Judge Haggerty issued a final judgment in a civil action filed by the Securities and Exchange Commission ("SEC") against Dooley. Judge Haggerty enjoined Dooley from ever serving as an officer or director of a public corporation and from future violations of federal securities laws. (Rosenbaum Decl. Ex. 9 at 2-6.) However, he elected not to assess a civil penalty against Dooley based on Dooley's Statement of Financial Condition dated May 20, 2009.[3] (Rosenbaum Decl. Ex. 9 at 6.)

In May 2010, ESI filed a motion for summary judgment in the arbitration proceedings arguing, among other things not relevant here, that Dooley's guilty plea constituted a judicial admission that his actions satisfied the requirements for cause under the terms of the Agreement and that Dooley was barred from arguing otherwise. ESI asserted that Dooley's admission that he acted knowingly and willfully and with an intent to defraud clearly established that Dooley willfully engaged in illegal conduct which qualified as "cause" under the Agreement. ESI offered a summary of Oregon and federal case law on the effect of a guilty plea and its application in a subsequent civil action based on the same conduct. In response, Dooley asserted that the issues in the criminal action were not the same as those presented in the arbitration. Dooley explained that the definition of cause in the Agreement required proof that Dooley knew his conduct was illegal and that because a defendant may be found guilty of securities fraud without knowing at the time of his actions that the conduct was illegal, a conviction for securities fraud may stand where the defendant knew his actions to be wrongful but not necessarily unlawful. Dooley relied on recent Ninth Circuit case law addressing the culpability requirements for violation of the statutes Dooley was found guilty of

---

[3]Dooley informed the SEC on May 21, 2009, in the interest of full disclosure and out of an abundance of caution, that he was considering pursuing severance benefits under the Agreement. (Petranovich Decl. Ex. 9.)

violating. In *United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009), the Ninth Circuit stated:

> A "knowing" falsification does not require knowledge of the securities laws being violated. On its face, the provision means only that the defendant must knowingly commit the act of falsification. On the basis of the language and structure of the statute, there is no textual reason to hold "knowingly," as used in § 78m(b)(5), was intended to modify or connote a higher scienter requirement than "willfully," as used in § 78ff(a).

Additionally, in support of his general statement that his position is "consistent with the well-established principle that a defendant may commit securities fraud throught reckless, rather than intentional, conduct", Dooley relied on *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) ("Scienter may be established, therefore, by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements.") and *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979) ("[T]he reckless disregard for truth or falsity is sufficient to sustain a finding of securities fraud."). (Petranovich Decl. Ex. 2 at 7.) ESI countered by arguing that Dooley's admission that he had an intent to defraud establishes that he intentionally violated a known legal duty and references *In re Silicon Graphics, Inc., Securities Litig.*, 183 F.3d 970-976-77 (9th Cir. 1999) for the proposition that "under Ninth Circuit law, even recklessness connotes intentional or knowing misconduct. (Petranovich Decl. Ex. 3 at 4.)

On June 25, 2010, Philip E. Cutler, acting as arbitrator under the authority of the American Arbitration Association (the "Arbitrator"), denied ESI's motion for summary judgment. On the issue of how Dooley's guilty plea relates to his claim for severance benefits under the Agreement, the Arbitrator noted that "[w]hile one would think that the guilty plead and conviction for a former CFO of a public company on a charge of securities fraud would give ample grounds for his employer to terminate his employment for cause, the issue is not so simple here." The Arbitrator then referenced

the definition of cause found in the Agreement and explained that:

> While both parties have cited to case law defining "willfully and knowingly" in the context of a securities violation like that which Dooley plead guilty to, I cannot say, on this record, that as a matter of law Dooley's guilty plea and conviction satisfy the employment agreement's requirement that Dooley have, "in knowing bad faith" and "without reasonable belief that his action or omission was in, or not opposed to, the best interests of ESI" engaged in "illegal conduct." Nor is it clear that there is no genuine issue of material fact relevant to a determination of that question even as a a matter of law or that I can resolve these issues without resorting to evaluating the credibility of witnesses. Moreover, does the just-quoted clause in the employment agreement mean that Dooley must have known at the time that his actions or omissions were illegal? Such knowledge is not an element of the offense with which he was charged. *U.S. v. Reyes*, – F.3d –, 2009 U.S. App. LEXIS 24575 (9th Cir. 2009).

In December 2010, the Arbitrator issued his final opinion again finding in favor of Dooley and awarding him $800,000 (the "Opinion"). (Rosenbaum Decl. Ex. 1 at 13.) In the Opinion, the Arbitrator quoted the definition of "cause" found in the Agreement and then explained that"

> in order for Dooley to be terminated "for cause," he must have:
>
> - "willfully" – *i.e.*, "in knowing bad faith" *and* "without reasonable belief that his action or omission was in, or not opposed to, the best interests of ESI" – engaged in "illegal conduct;" *and*
>
> - the illegal conduct must have been "materially *and* demonstrably injurious" to ESI.
>
> However, if Dooley acted (or failed to act) based on advice or counsel of ESI's attorney, or pursuant to Board resolution, he must be found to have acted in good faith and in ESI's best interest in acting or failing to act.

(Rosenbaum Decl. Ex. 1 at 4.) The Arbitrator found that ESI suffered material and demonstrable injury based on Dooley's actions and that the Board followed the proper procedures in terminating Dooley. (Rosenbaum Decl. Ex. 1 at 11-12.) The Arbitrator then addressed the specific reasons given by the Board for Dooley's termination.

The Arbitrator acknowledged that Dooley's handling of the Benefits was the primary reason for the Board's action and addressed Dooley's conduct with regard to the elimination of the Benefits. (Rosenbaum Decl. Ex. 1 at 6-10.) In the paragraph specifically addressing Dooley's actions in September, 2002, which supported Dooley's conviction on Count 11, the Arbitrator explained that:

> Richard Callahan testified that on September 12 or 13 Dooley advised him that the elimination of the Japanese termination benefits had been approved by ESI's lawyer. One would expect that, had Dooley done so, Callahan would have memorialized that representation in some fashion. He did not. Other witnesses testified that Dooley made the same representation to the Audit Committee at its September 17th meeting. One would also expect that the minutes of that meeting (either by the note-taker at the meeting or in the final minutes) would memorialize that representation had it occurred. They did not. Accordingly, I conclude that Dooley did not make such a representation either to Callahan or to the Audit Committee and the witnesses who so testified were in error.

(Rosenbaum Decl. Ex . 1 at 7.) After discussing other conduct relevant to the Benefits, the Arbitrator concluded that:

> It is clear that Dooley approached the whole issue of termination of the Japanese benefits from the wrong perspective. I, as a lawyer, would have asked a different question to the Japanese lawyers, or to Dooley's staff, and would have followed up differently; Dooley, however, is not a lawyer and cannot be expected to think or act like one. The evidence is sufficient to establish that Dooley believed that the benefits were not required, that terminating them was a business decision, and that under his understanding of accounting rules the accrual for them could be reversed. Moreover, the evidence is insufficient to establish that his actions were motivated by personal gain, even though reducing ESI's FY 2003 1st or 2nd quarter losses, or bringing the quarterly results more in line with prior projections would potentially benefit him either by increasing his bonus or giving him a leg up in the search for a new CEO. The totality of the evidence is insufficient to establish that Dooley acted, or failed to act, in such a way as to bring his conduct with the scope of the "for cause" definition in the employment agreement.

(Rosenbaum Decl. Ex. 1 at 10.) In two paragraphs, the Arbitrator summarily addressed other conduct unrelated to the Benefits but relied on by the Board in terminating Dooley:

> In addition to finding that Dooley directed the misstatement, and knowingly

> and falsely certifying to the accuracy, of ESI's financial statements, the Board also found that Dooley "knowingly [participated] in other improper and illegal conduct relating to the financial affairs and reports of ESI." These latter charges relate to the second through fifth bullet points in the summary of the Audit Committee's finding concerning Dooley which underlay the Board's action. (The creation of "an environment bereft of meaningful accounting controls which resulted in significant restatement of expenses in the first three quarters of 2003"; the "hunt for credits" and Dooley's knowledge concerning questionable, unsupported adjustments undisclosed to the Audit Committee, the Board and the auditors; Dooley's failure "to establish reasonable accounting practices to ensure proper recognition of revenue for "high risk" transactions"; and the fostering of a "tone from the top" creating an atmosphere of undue pressure to book revenue and meet quarterly forecasts without regard to proper practices and procedures").
>
> There is insufficient credible evidence to support a finding or conclusion that, even if Dooley was guilty of these charges, his conduct (or his failures or omissions) met the "for cause" standard required under his employment agreement. Nor is there sufficient credible evidence to support a finding or conclusion that any other act or omission by Dooley met the "for cause" standard.

(Rosenbaum Decl. Ex. 1 at 10-11 (citations omitted).) In the Opinion, the Arbitrator addressed the issue of judicial estoppel as it relates to Dooley's guilty plea to and conviction of securities fraud as follows:

> Dooley was indicted by a federal grand jury in 2004 on a variety of counts of financial and/or securities fraud. This indictment was amended by a superseding indictment filed in June 2005. The superceding indictment charged Dooley with 16 counts of financial and/or securities fraud. One count of the latter indictment charged him with a violation of federal securities law, which makes [it] a crime for one to "willfully and knowingly" make false or misleading statements to a public company's accountants in connection with their work on the company's publicly-filed financial statements, a charge which stemmed from Dooley's September 2002 interactions with ESI's outside auditors regarding reversal of the Asian benefits accrual.
>
> In June 2007 Dooley plead guilty to and was convicted on that count of the indictment; under the terms of his plea agreement, the remaining counts were to be dismissed upon sentencing,and those counts were thereafter dismissed. At the hearing on his plea petition, Dooley made a statement to the Court that set forth the facts concerning his plea. Neither those facts nor his conviction by the Court, nor any papers submitted in connection with his plea, are sufficient to establish that Dooley wilfully engaged in illegal conduct within the meaning of the employment

> agreement. Nor do the legal authorities submitted by the parties in connection with this issue compel such a finding or conclusion. Similarly, these events do not constitute a judicial admission that he wilfully engaged in "illegal conduct" within the meaning of the employment agreement, thus estopping him to contend otherwise at the Hearing."

(Rosenbaum Decl. Ex. 1 at 12-13 (footnotes omitted).)

*Legal Standard*

The Federal Arbitration Act (9 U.S.C. § 1 et seq.)(the "Act") controls the arbitration of employment contracts, with the exception of contracts of employment for transportation workers. *Circuit City Stores Inc. v. Saint Clair Adams*, 532 U.S. 105, 119 (2001) ("Section 1 exempts from the [Act] only contracts of employment of transportation workers.") Under the Act, a district court may vacate an arbitration award only:

> (1) where the award was procured by corruption, fraud or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a) (2007). "These grounds afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration proceedings." *Kyocera Corp. v. Prudential-Bach Trade Services, Inc.*, 341 F.3d 987, 998 (9th Cir. 2003). To that end, a district court's review of an arbitration award is "both limited and highly deferential." *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277, 1288 (9th Cir.

2009) (quoting *Poweragent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1198 (9th Cir. 2004).

A district court cannot review the merits of arbitration awards, and the question of whether an arbitrator's finding are supported by the evidence is beyond the scope of the court's review. *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 640-42 (9th Cir. 2010). However, the Ninth Circuit has held that in the rare instance where an arbitration award is "completely irrational" or exhibits a "manifest disregard of law," the arbitrator has exceeded his powers under subsection four and an otherwise procedurally proper arbitration award may be vacated. *Id.* at 641 (quoting *Kyocera* , 341 F.3d at 997). "Manifest disregard of the law means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law. It must be clear from the record that the arbitrators recognized the applicable law and then ignored it." *Mich. Mut. Ins. Co., v Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995)(internal quotation omitted). "Moreover, to rise to the level of manifest disregard '[t]he governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.'" *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879-80 (9th Cir. 2007) (quoting *Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004)). On the other hand, an arbitration award is "completely irrational" if the decision fails to draw from the essence of the agreement or, in other words, is not derived from the agreement when viewed in light of the word of the contract and the conduct of the parties. *Lagstein*, 607 F.3d at 642 (citing *Bosack, v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009)). While the court may conduct a very limited review of an arbitrator's legal conclusions, factual findings are generally not subject to the manifest disregard standard. *See Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003)("Manifest disregard of the facts is not an independent ground for vacatur in this circuit.").

However, "because facts and law are often intertwined, an arbitrator's failure to recognize undisputed, legally dispositive facts may properly be deemed a manifest disregard for the law." *Id.* at 1134.

*Discussion*

I. Arbitrator Exceeded, or Imperfectly Executed, Powers

ESI contends that the Arbitrator failed to give preclusive effect to Dooley's guilty plea in finding that Dooley did not knowingly engage in illegal conduct. ESI argues that Dooley was collaterally estopped from claiming that he acted negligently or recklessly based on his admission that he acted knowingly and willfully and with an intent to defraud when he informed Callahan that the elimination of the Benefits was legal.

Collateral estoppel, or issue preclusion, arises when an issue of ultimate fact has been determined in a prior proceeding. *Nelson v. Emerald People's Utility Dist.*, 318 Or. 99, 102-103 (1994). In *Nelson*, the Oregon Supreme Court set forth a five-part test which provides that:

> If one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met:
>
> 1. The issue in the two proceedings is identical.
>
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.
>
> 3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.
>
> 4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.
>
> 5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Id.* at 104 (citations and footnote omitted). In Oregon, as in the Ninth Circuit, a criminal conviction based on a guilty plea can have preclusive effect in a later civil proceeding. *State Farm Fire and Cas. Co. v. Sallak*, 140 Or . App. 89, 94 (1996)(citing *United States v. Bejar-Matrecios*, 618 F.2d 81, 83 (9th Cir. 1980)). "A guilty plea is an admission of the ultimate facts that are the material elements of the crime charged in the indictment." *Sallak*, 140 Or . App. at 93 (citing *State v. Hetland*, 31 Or. App. 529, 534 (1977)). "Arbitrators are not free to ignore the preclusive effect of prior judgments under the doctrines of res judicata and collateral estoppel, although they generally are entitled to determine in the first instance whether to give the prior judicial determination preclusive effect." *Collins*, 505 F.3d at 880 (quoting *Aircraft Braking Sys. Corp. v. Local 856*, 97 F.3d 155, 159 (6th Cir. 1996)).

While ESI argues that all of the elements are met, Dooley's asserts, and the Arbitrator found, that the issues in the two proceedings were not identical. The Arbitrator determined that the word "willfull" means something different in the context of a securities fraud violation as opposed to under the Agreement and that collateral estoppel does not apply in this instance. Therefore, the pivotal question before the court is whether the Arbitrator properly identified, but then ignored, relevant case law in determining that the definition of the term "cause" as used in the Agreement included an element that Dooley act with the knowledge that his conduct was illegal and that his plea of guilty and subsequent conviction on Count 11 did not necessarily support such a finding.

ESI does not contest here the Arbitrator's construction of the definition of cause as set forth in the Agreement. The Arbitrator analyzed the definition and determined that, for the purposes of the Agreement, the term "willful" comprised three elements: 1) knowing bad faith; 2) without reasonable belief that the actions or omissions were in, or not opposed to, the best interests of ESI;

and 3) illegal conduct. Based on these elements, the Arbitrator found that for cause to exist under the terms of the Agreement, Dooley must have known at the time that the conduct he intentionally engaged in was illegal. This analysis and finding does not fly in the face of clearly established case law and is, in fact, a reasonable construction of that law. There is no evidence that the Arbitrator ignored clearly established law in reaching this conclusion. Similarly, this construction of the terms of the Agreement respects the essence of the Agreement and is not clearly irrational.

What ESI does object to, and strongly, is the Arbitrator's finding that Dooley's admission, through his plea of guilty to securities fraud, that he willfully, knowingly, and with the intent to defraud, made material and misleading statements to his accountant is not equal to an admission that Dooley knew that this intentional conduct was illegal. The Arbitrator found that knowledge of the defendant at the time that his actions or omissions were illegal is not an element of the offense to which Dooley pled guilty. In doing so, he relied on Ninth Circuit case law which establishes that to be found guilty of the crime of securities fraud based on willful false and misleading statements, a defendant must be aware that his statements are false, not that the conduct is illegal. *See United States v. Reyes*, 577 F.3d 1069, 1079-81 (9th Cir. 2009). Here, the Arbitrator referenced relevant case law and abided by it, following it to the letter. His finding that Dooley's guilty plea to securities fraud did not necessarily establish that he knew he was engaging in illegal or unlawful conduct at the time he told Callahan that the elimination of the Benefits for Japanese workers complied with Japanese laws similarly complied with applicable law. Accordingly, the Arbitrator's decision to allow Dooley to present evidence regarding his mental state at the time he made the false representations was not in manifest disregard of the applicable law but, rather, in compliance with it and was not adverse to the essence of the Agreement.

ESI argues that *Reyes* is not applicable to the case at hand because the defendant in *Reyes* was accused of conduct under the first clause of 15 U.S.C. § 78ff(a) addressing only "willfull" violations while Dooley was sentenced under the second clause for "willfully and knowingly" making a false statement. ESI argues that the addition of the term "knowingly" in the second clause requires proof of a higher standard of culpability. It is important to note that Dooley admitted to engaging in activity made unlawful under § 78(m) and that § 78ff(a) merely provides the penalties for violations of other sections of the Securities Act. Therefore, the language in §78ff(a) does not define the elements of the underlying criminal conduct. In any event, ESI's argument is not supported by the language of *Reyes*.

In *Reyes*, the court referred to § 78ff(a) in its entirety – it did not differentiate between the clauses contained therein. Furthermore, the *Reyes* court specifically addressed the use of the term "knowingly" in § 78ff(a), noting that there was no textual reason to construe "knowingly" in § 78ff(a) as modifying or connoting a higher scienter requirement than "willfully" as used in § 78(m), and relying on legislative history in which Congress explained its understanding of the term "knowingly" in connection with amendments to § 78(m) as follows:

> The committee believes that the inclusion of the "knowingly" standard is appropriate because of the danger, inherent in matters relating to financial recordkeeping, that inadvertent misstatements or minor discrepancies arising from an unwitting error in judgment might be deemed actionable. The committee does not, however, intend that the use of the term "knowingly" will provide a defense for those who shield themselves from the facts. The knowledge required is that the defendant be aware that he is committing the act which is false – not that he know that his conduct is illegal.

*Reyes*, 577 F.3d at 1080-81 (quoting S. Rep. No. 95-114, at 9 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098, 7107).

In its reply brief, ESI argues that in addition to manifestly disregarding the law, the Arbitrator ignored legally dispositive facts with regard to Dooley's illegal actions and state of mind. ESI presents evidence to establish that Dooley knew, or at the very least, should have known, that his actions were illegal at the time of the conduct, including declarations from Callahan and an ESI board member representing that Dooley informed them in September 2002 that the termination of the Benefits had been approved by legal counsel. Dooley denied representing that he had obtained approval from legal counsel to terminate the Benefits in both his guilty plea and before the Arbitrator. A genuine issue of fact existed with regard to Dooley's state of mind at the time the false statements or omissions occurred. The Arbitrator acknowledged this and found in Dooley's favor and explained his reasons for doing so. This court "has no authority to re-weigh the evidence" and, as such, is unable to find that the Arbitrator manifestly disregarded the law by finding that Dooley did not act with the knowledge that his conduct was illegal. *Coutee*, 336 F.3d at 1134.

An arbitrator exceeds his powers only when an arbitration award is completely irrational or exhibits a manifest disregard of the law. Here, the Arbitrator recognized federal securities law, reasonably construed that law, and applied the law so construed to the facts before him. The Arbitrator's conclusion was not completely irrational nor did it exhibit a manifest disregard for the law. Accordingly, the Arbitrator did not exceed his powers and this court has lacks authority to vacate the Arbitrator's finding that ESI's termination of Dooley was not for cause.

II. Public Policy

*A. Dooley's Representations to the SEC*

ESI also argues that the Arbitrator's award of nearly one million dollars in severance benefits to Dooley is "an affront to the well-established public policy against allowing corporate executives

who willfully violate federal securities laws from benefitting from their illegal conduct at the company's – and the public's – expense." (Memo. In Supp. of Pl.'s Mot. to Vacate Arbitration Award at 18.) In support of this argument, ESI points to Dooley's Statement of Financial Condition on which the SEC relied in not seeking a civil penalty against Dooley, a statement which did not include the possibility of a severance payment from ESI. This argument fails for two reasons. First, Dooley advised the SEC of the possibility that he might seek severance benefits under the Agreement by letter dated May 21, 2009. Therefore, the SEC was aware of this possible asset before presenting the proposed final judgment to Judge Haggerty for signature in September 2009. Second, ESI did not make the argument to the Arbitrator and is, therefore, precluded from rasing that issue for the first time before this court. Section 10 of the Act provides the exclusive grounds for expedited vacatur of an arbitration award. *Hall Street Assoc.'s, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) ("We now hold that §§ 10 and 11 respectively provide the [Act's] exclusive grounds for expedited vacatur and modification.) In the absence of allegations of corruption, fraud, partiality or misconduct, the only ground relevant to this argument is subsection four – exceeding the arbitrator's powers. There is no evidence that the Arbitrator recognized, and then rejected, law relating to the public policy argument or that the public policy argument altered the essence of the agreement making the Opinion completely irrational. ESI's public policy argument related to Dooley's representations to the SEC does not warrant vacation of the Arbitrator's award.

*B. Securities Law and Its Public Policy*

Assuming a public policy defense remains available under the Act in light of the Supreme Court's ruling in *Hall Street* and that it is appropriate for this court to consider this argument despite the failure of ESI to raise the issue in the arbitration proceeding, the court is convinced that the

public policy argument is not applicable to the facts at hand. In situations where a party may rely on a public policy argument to prevent the enforcement of an arbitration award, the asserted public policy must be explicit, well defined, and dominant. *W.R. Grace and Co. v. Rubber Workers*, 461 U.S. 757, 765 (1983). Such a public policy "is to be ascertained 'by reference to the laws and legal precedents . . . .'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945). "A formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award. . . ." *United Paperworkers Int'l Union, v. Misco, Inc.*, 484 U.S. 29, 44 (1987) (quoting *W.R. Grace*, 461 U.S. at 765). ESI relies on provisions of the Sarbanes-Oxley Act of 2002, specifically 15 U.S.C. § 78u-3(c)(3) and 15 U.S.C. § 7243, in support of its argument that public policy would be violated if Dooley was allowed to receive his severance benefits under the Agreement.

The Sarbanes-Oxley Act was the congressional response to the then-recent corporate accounting scandals that left persons, companies, and pension plans "holding an empty bag after corporate insiders committed fraud and other corporate crimes and misdeeds at the ultimate expense of the corporation's shareholders, creditors, and innocent employees." *SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1035 (9th Cir. 2005). Congress clearly intended to "provide a strong shield for third-party creditor and corporate investors once the SEC beings an investigation of corporate malfeasance." *Id.* at 1036. Generally, "[d]isgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). To this end, the Sarbanes-Oxley Act creates a mechanism to hold those who control the distribution of illegally obtained funds personally liable for both dissipated and retained funds. *SEC v. Platforms Wireless*

*Int'l. Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010).

15 U.S.C. § 78-3(c)(3) authorizes the SEC to retain in escrow "extraordinary' payments scheduled to be made to possible securities law violators. In *Gemstar-TV,* the Ninth Circuit defined the term "extraordinary" as used in the statute to mean "a payment that would not typically be made by a company in its customary course of business" with the standard of comparison being the "company's common or regular behavior." *Id.* at 1045. In determining whether a specific payment is "extraordinary", a court should concentrate on the size, nature, purpose, and circumstance of the payments. *Id.* at 1046. The court then distinguished fixed amounts due under a long-standing employment contract from newly negotiated termination benefits which exceeded base salary by more than five times, bonuses and salary based on the company's financial results which had dramatically increased as a result of the possible securities law violations, and accrued unused salary that was not allowed under the original employment agreement, and found only the latter qualify as "extraordinary" payments under the statute. *Id.* at 1043-44. Similarly, 15 U.S.C. § 7243 requires a chief financial officer or chief operating officer to reimburse its employer for "any bonus or other incentive-based or equity-based compensation received by that person during the 12-month period following the first public issuance or filing" of a financial document which fails to comply with financial reporting requirements under federal securities and "any profits realized from the sale of securities of the issuer during that 12-month period." The Ninth Circuit has held that this statute does not create a private right of action but may be enforced only through the SEC and the equitable power of the courts. *In Re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1233 (2008).

The specific language of the statutes, and the cases construing them, make it clear that they do not clearly and unequivocally apply to the severance benefits Dooley is seeking under the

Agreement. Payments required to be disgorged by a securities law violator under the Sarbanes-Oxley Act of 2002 are limited to those directly related to violators' conduct and the change in the financial condition of corporation caused by the violating conduct. The challenged payments do not include those set by the parties in the initial employment agreement, except to the extent the amounts paid under the agreement are based on the company's financial condition. Dooley's entitlement to severance benefits was set forth in the Agreement, was based on his base salary, and was in no way contingent upon or linked to ESI's financial condition. Additionally, only the SEC and the court have the authority to enforce the statutes relied on by ESI. Here, the SEC, with the knowledge that Dooley may seek severance benefits under the Agreement, determined that disgorgement was not necessary or appropriate in these circumstances. The severance benefits are not covered by either statute or by the public policy concerns motivating Congress at the time the statutes were enacted as established by reference to current laws and legal precedents. Accordingly, the court finds that ESI has not clearly shown that payment of severance benefits to Dooley under the terms of the Agreement violates an explicit, well-defined and dominant public policy.

*Conclusion*

The Opinion was not completely irrational, the Arbitrator did not manifestly disregard the law, and the payment of severance benefits to Dooley will not violate public policy. Accordingly, this court does not have grounds to vacate the Arbitrator's award. ESI's Second Amended Motion (#13) to vacate the arbitration award is DENIED.

DATED this 17th day of May, 2011.

JOHN V. ACOSTA
United States Magistrate Judge